142 F.3d 442
 81 A.F.T.R.2d 98-1818, 98-1 USTC P 50,398
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
BERRY PETROLEUM COMPANY AND SUBSIDIARIES, Petitioner-Appellant,
v.
Commissioner of Internal Revenue, Respondent-Appellee.
 No. 95-70814.
 Tax Ct. No. 28578-91.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 4, 1997.
Decided April 22, 1998.
 
 1
 Appeal from a Decision of the United States Tax Court Renato Beghe, Tax Court Judge, Presiding.
 
 
 2
 Before BROWNING and KLEINFELD, Circuit Judges, and MERHIGE**, District Judge.
 
 
 3
 MEMORANDUM*
 
 
 4
 We review the several issues raised by Berry on appeal from the Tax Court. We find the well written Tax Court opinion persuasive in every respect.
 
 
 5
 A. Wiegand litigation expenses.
 
 
 6
 Berry argues that the Wiegand litigation expenses should have been allowed as deductions, because they arose out of Berry's conduct of its business, and need not be capitalized on the theory that they arose out of the merger by which Berry acquired the Norris stock. Berry correctly argues that a "but for" relationship to the merger is not enough to require capitalization. For the selling class, Berry argues that the justification for capitalizing litigation expenses is especially weak, because Berry did not acquire those shares.
 
 
 7
 Woodward v. Commissioner, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970), holds that the standard for whether an expense must be capitalized or deducted is "the origin and character of the claim against the taxpayer," as opposed to whether the taxpayer's "primary purpose" is to defend or perfect title. Id. at 577, 578. Berry would have us distinguish Woodward on the ground that it involves appraisal expenses, but that is a distinction without a difference. What mattered in Woodward is that the origin and character of the claim was a dispute about the price of the stock the taxpayer was acquiring, not whether the expense was for appraisal or something else.
 
 
 8
 The companion case to Woodward, United States v. Hilton Hotels Corp., 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970), emphasizes that "the expenses of litigation that arise out of the acquisition of a capital asset are capital expenses, quite apart from whether the taxpayer's purpose in incurring them is the defense or perfection of title to property." Hilton Hotels at 583. This comment by the court renders immaterial the distinction Berry would have us draw between expenses relating to the selling class and expenses relating to the merger class. Hilton Hotels establishes that the distinction between the two cases relating to when title to the stock passed "is a distinction without a difference." Id. at 584.
 
 
 9
 We applied Woodward and Hilton Hotels in Locke v. Commissioner, 568 F.2d 663 (9th Cir.1978), to a fraud claim against a chief executive officer for buying shares by understating their value. Appraisal was not at issue, just fraud in the purchase of shares. The jury found there was no fraud, but alleged fraud had been the origin and character of the claim against the taxpayer. Our decision in Locke makes untenable Berry's attempt to distinguish Woodward and Hilton Hotels.
 
 
 10
 This case went to trial, and the Tax Court made findings of fact. One of the findings was that "the Wiegand litigation had its origins in petitioner's acquisition of Norris stock that culminated in the Norris merger." The Tax Court explained that Berry's position on both sides of the merger gave rise to a fiduciary duty that the Wiegand classes claimed it breached, and the theory of the Wiegand lawsuit, its material facts, and the controlling law, all had their origins in the acquisition of the Norris stock by Berry. The original complaint alleged damages as a result of the merger. The claims of both classes, the selling class and the merger class, had their origins in Berry's acquisition of the Norris stock.
 
 
 11
 We find this analysis persuasive. We need not determine whether our standard of review is de novo, as petitioner argues, or only for clear error, as the Commissioner claims, because we would agree with the Tax court's analysis on the facts of this particular case either way. What Berry was sued for was fraud against two classes of shareholders in representations made for purposes of the merger. The claim was that Berry undervalued the Norris stock and overvalued its own, for purposes of accomplishing the merger, thereby damaging the selling class and the merger class. Whether well founded or not, the origin and character of the claim was fraud in the representations made to accomplish the merger at a good price, not merely fraud in the operation of the companies which was incidental to the merger and related to it only in a "but for" sense.
 
 
 12
 B. Net loss carryover.
 
 
 13
 Berry argues that the net loss carryforward provision in subsection (A) does not apply unless the 1/3 test of subsection (B) is satisfied with respect to the old loss corporation. 26 U.S.C. § 382(1)(4)(A),(B). The statute is, as the Tax Court said, hard to read. The arguments about legislative history and purpose made by each side are indeterminate. We conclude that the most plausible interpretation of the words and syntax are as the Tax Court concluded. Subsection (1)(4)(A) operates if, as it says, "immediately after an ownership change, the new loss corporation has substantial nonbusiness assets" (emphasis added). The test is "substantial" for the new loss corporation, not 1/3. (In this case, the nonbusiness assets of the new loss corporation were both substantial and more than 1/3.) Subsection (1)(4)(B) says that the "old loss corporation" (emphasis added) is treated as having substantial nonbusiness assets if at least 1/3 of the value of its total assets is nonbusiness. We are not sure why Congress said "old" in subsection (B), but it did, so the 1/3 test must be for the "old loss corporation" and not necessarily the new. Nor can we find the condition Berry argues should be read into the statute. The words of condition are just not there.
 
 
 14
 Berry also argues that the nonbusiness assets of the new loss corporation were not "substantial" at the relevant time, "immediately" after the ownership change. We reach the same conclusion as the Tax Court. The acquiring corporation was obligated to sell Placerita from the moment it acquired, so "immediately" after the acquisition, it was nonbusiness property. If the cash received for Placerita were treated as the property, then, as the Tax Court said, Berry did not carry its burden of proof to show that it was a business asset.
 
 
 15
 Berry argues that cancellation of the $3.6 million C.J. loan to Bush should not have been treated as a corporate contraction under 26 U.S.C. § 382(e)(2). The Tax Court held that when a controlling shareholder withdraws funds from its controlled corporation, the question whether this is a bona fide loan is factual, depending initially on the controlling corporation's intention to repay and the controlled corporation's intention to enforce collection. The Tax Court found that because no principal was ever paid or demanded, and the loan was cancelled within 6 months, and because the controlling corporation had limited ability to repay, the loan was a corporate contraction. The finding was not clearly erroneous.
 
 
 16
 Berry argues that the redemption was not "in connection with the ownership change, for purposes of 26 U.S.C. § 382(e)(2), based on our interpretation of an analogous provision in a different statute in In re Kroy, 27 F.3d 367 (9th Cir.1994). We agree with the Tax Court that Kroy is distinguishable both factually and because it construes a different statute. The Tax Court's determination that the acquisition left Bush short of money, so that it needed a cash infusion, and took it by means of the redemption, is a finding of fact which was not clearly erroneous. That the entire Berry group may have had plenty of cash reserves, as Berry argues, does not vitiate the basis of the Tax Court's conclusion. They might have had the money, but wanted the acquisition to stand on its own without being a drain on the group.
 
 
 17
 The crux of the valuation argument Berry makes is whether Teorco's value should be established by the value of its net assets, or by looking at the price for which it was acquired. As the Tax Court found, Teorco had substantial risk of unliquidated environmental liabilities, so the value of the business was less than the sum of the values of its assets. That is obviously why the Placerita lease was worth more than the whole company including the Placerita lease to Tenneco, which priced both.
 
 
 18
 AFFIRMED.
 
 
 
 **
 The Honorable Robert R. Merhige, Senior United States District Judge, for the Eastern District of Virginia, sitting by designation
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3